

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BREAKWATER SHORES** | § | Case No. 10-61254 |
| **PARTNERS, L.P.** | § | |
| **f/k/a Lighthouse Landing Partners, L.P.** | § | |
| xx-xxx9375 | § | |
| P.O. Box 1150, Mabank, TX 75147 | § | |
| | § | |
| Debtor | § | Chapter 11 |

## <u>MEMORANDUM OF DECISION</u>

The Court has heard and considered the Debtor's Amended Motion to Determine

Ad Valorem Tax Liabilities Under 11 U.S.C. §505 (the "Motion") filed by the Debtor and

Debtor-in-Possession, Breakwater Shores Partners, L.P. f/k/a Lighthouse Landing

Partners, L.P. ("Debtor"), seeking a valuation of certain real property for the purpose of

creating a foundation for the proper assessment of ad valorem taxes against the above-

referenced bankruptcy estate.  Despite proper notice, the Motion and the relief it seeks

was not contested by the Kaufman County Appraisal District ("KCAD" or the "District"),

the entity that is statutorily authorized under state law to value property for use by

appropriate taxing authorities, nor did KCAD make any appearance at the duly-noticed

hearing.[1]  However, one of those affected taxing authorities, Kaufman County (the

"County"), asserted an objection to the Motion.  The Motion seeks a determination of the

---

[1] An appraisal district is established in each county in Texas and "is responsible for appraising property in the district for ad valorem tax purposes of each taxing unit that imposes ad valorem taxes on property in the district."  1 TEX. TAX CODE ANN. § 6.01(b) (Vernon 2008).

valuation of the real property inventory held by the bankruptcy estate for the tax years 2007 through 2011.  The County asserts that the assessments made by KCAD should be upheld by this Court on various grounds.  After hearing, the Court took the matter under advisement.  This memorandum of decision disposes of all issues pending before the Court.[2]

*Background*

The Debtor, Breakwater Shores Partners, L.P., owns a residential real estate development known as Lighthouse Landing that is located on Cedar Creek Lake, in Mabank, Kaufman County, Texas.  Lot sales to individual owners began in 2004 based upon the platting of 61 lots in Phase I of the development and, because the Debtor believed that the development would eventually be annexed into the City of Mabank, it met all of the requirements of that municipality in terms of engineering as it developed the streets and utilities for the development.  Thus, considerable expense was advanced by the Debtor in the early 2000's for acquisition and engineering work in Phase I.

Today, 20 of the original 61 lots platted in Phase I have been sold, but only two in the last two years, both of which were off-water lots.  Thus, the Debtor owns the remaining 41 platted, but unimproved, residential lots in Phase I, most of which are off-water lots, as well as two undeveloped tracts to the west, consisting of 65.22 acres and

---

[2]  This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a).  The Court has authority to enter a final order in this contested matter since it constitutes a core proceeding under 28 U.S.C. §157(b).

8.91 acres respectively, known as Phase II.  The Debtor owns no improved realty.  The Debtor owns no property for commercial use.  The Debtor holds the residential real property for sale and realizes no income until such time as a parcel is sold.

In 2007, KCAD assumed responsibility for appraising the Debtor's real property for the purposes of ad valorem tax assessments.  Since the Phase I lots were platted in 2004, the lots available for sale in Phase I have always been listed and valued on KCAD's appraisal rolls as separate lots with separate appraised values being assigned to each particular Phase I lot.  They have never been singularly listed on KCAD's appraisal roll as a bulk inventory.  The aggregate taxable values of the Debtor's property on January 1 as appraised by KCAD have been as follows for the past five years:  2007: $2,168,390; 2008: $2,869,320; 2009: $2,510,320; 2010: $2,354,980; and 2011: $2,354,980.

For a number of years the Debtor took no affirmative action to protest the listings and valuations of its property on the KCAD appraisal rolls.[3]  That changed as to the 2010 tax year and the 2011 tax year.  The Debtor timely filed a motion for correction with the

---

[3]  There were intimations offered at the hearing that a prior agent of the Debtor had settled some of the appraisal accounts with KCAD in the earlier years.  However, no evidence of any such settlement(s) was properly admitted over objection.  The Chief Appraiser had no personal knowledge of such settlements or the statements contained therein.  Since the statements were coming from an outside source and were not, in fact, made by KCAD in the ordinary course of its business, they are not admissible as business records merely because they were kept in KCAD's files.  FED. R. EVID. 803(6); *U.S. v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000); *U.S. v. Ismoila*, 100 F.3d 380, 392 (5th Cir. 1996); *Dittmer v. Texas S. Univ.*, 2011 WL 2162222, at *6 (S.D. Tex., June 2, 2011).  Further, the statements were not admissible as part of a public record.  FED. R. EVID. 803(8).  "The Fifth Circuit has clarified that the public records exception to the hearsay rule applies if:  first, the person making the record observed the matters contained in the record firsthand pursuant to a duty imposed by law; second, the record is prepared pursuant to a duty imposed by law; and third, the documents and surrounding circumstances indicate trustworthiness."  *Hardy v. City of Tupelo, Miss.*, 2009 WL 2136547, at *3 (N.D. Miss., July 10, 2009) (citing *U.S. v. Central Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984)).

District in January 2011 for the tax year 2010.[4]  It subsequently tendered on a timely basis

a rendition of its property for tax year 2011.[5]  The present motion for determination filed

in this Court was also filed in a timely manner consistent with the prescribed state law

schedule.

In its motion, the Debtor seeks a determination that its real property in both phases

of its development has not ever been properly valued as inventory by KCAD as required

by Texas Property Tax Code §23.12 and that such errors, encompassing tax years 2007,

2008, 2009, 2010 and 2011, resulted in dramatically inflated appraisal values for the

Debtor's residential real estate inventory.  According to the Debtor, those inflated values

correspondingly resulted in dramatically inflated tax bills issued to the Debtor from

various taxing authorities in those years, including that of Kaufman County.

*Discussion*

Section 505(a) of the Bankruptcy Code provides, in relevant part, that:

(1)  Except as provided in paragraph (2) of this subsection, the court may
determine the amount or legality of any tax, any fine or penalty relating to a
tax, or any addition to tax, whether or not previously assessed, whether or
not paid, and whether or not contested before and adjudicated by a judicial
or administrative tribunal of competent jurisdiction.

(2)  The court may not so determine —

---

[4]  Ex. 10.

[5]  Ex. 18.

**-4-**

> (A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount of legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title;
>
> . . .
>
> (C)  the amount or legality of any amount arising in connection with an ad valorem tax on real or personal property of the estate, if the applicable period for contesting or redetermining that amount under applicable nonbankruptcy law has expired.

Thus, the exercise of jurisdiction by this Court to determine a tax liability may be statutorily precluded because one of the subsections of §505(a)(2) has been properly invoked.  *Internal Revenue Serv. v. Teal (In re Teal)*, 16 F.3d 619, 622 (5th Cir. 1994). Even if such statutory preclusions are not properly invoked, the exercise of jurisdiction under §505 is discretionary with this Court.

*Jurisdictional Preclusion: §505(a)(2)(C)*[6]

Congress added §505(a)(2)(C) in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  On its face, it seems to be a

---

[6]  The County also argued the application of §505(a)(2)(A) to preclude the Court's consideration of the Debtor's determination motion.  However, as indicated earlier, the record contains no evidence of a settlement or other prior adjudication by which the statutory preclusion of §505(a)(2)(A) has been properly invoked.  *See supra* note 3.

straightforward preclusion of the invocation of the jurisdiction of a bankruptcy court under §505 to determine the amount of an ad valorem tax claim "if the applicable period for contesting or determinating that amount under applicable nonbankruptcy law has expired."  The case law interpreting this new subsection is sparse, but every case notes the failure of the statute to delineate the specific point in time from which the "expiration" is to be judged and the lack of any legislative history to provide assistance in determining  congressional intent.  Each court therefore is forced to make its best judgment as to the operative date.  Should it be the commencement of the case, or the filing of the §505 motion, or the date of the §505 hearing, or the date of the entry of an order regarding the valuation?  *See, e.g. In re The Village at Oakwell Farms, Ltd.*, 428 B.R. 372 (Bankr. W.D. Tex. 2010) [finding that for the small subset of tax claims it addresses, §505(a)(2)(C) requires a determination request to be filed prior to the expiration of the deadline established for review under state law and weighing the possible options for the timing of that expiration]; *In re ATA Airlines, Inc.*, 2010 WL 3955574 at *2 (Bankr. S.D. Ind., Oct. 4, 2010) [judging the expiration date to be required by statute as before the filing of the §505 motion]; *but see In re Read*, 442 B.R. 839, 844 (Bankr. M.D. Fla. 2011) [determination precluded under § 505(a)(2)(C) only when the state law period has expired; otherwise, §108(a) is still available to extend the deadline].

As to the valuations of the Debtor's real property arising for tax years 2007, 2008, and 2009 in this case, such case law distinctions make no difference.  Under the comprehensive scheme existing under the Texas Property Tax Code for the determination

-6-

and appeal of property tax appraisals in Texas,[7] the redetermination of an appraised value for a tract of real property must be initiated by the filing of a notice of protest by the property owner by June 1 or the 30th day after the date that the notice of appraised value issued under §25.19 was delivered to the property owner, whichever is later.  2 TEX. PROP. TAX CODE §41.44(a)(2) (Vernon 2008).  Without the timely filing of a notice of protest and the exhaustion of that administrative remedy, the taxpayer forfeits the right to further challenge.  2 TEX. PROP. TAX CODE §42.09(a) (Vernon 2008); *Houston Independent School Dist. v. Morris*, 355 S.W.3d 668, 675 (Tex. App.– Houston [1st Dist.] 2011, pet. filed) (citing *Robstown Independent School Dist. v. Anderson*, 706 S.W.2d 952, 953 (Tex. 1986)).

There is no evidence in the record that the Debtor timely tendered protests or motions for correction with the applicable appraisal review board for the valuations appraised for tax years 2007, 2008, and 2009.  As to the proper interpretation of §505(a)(2)(C), the Court is persuaded by the rationale expressed in *Oakwell Farms* decision that the statute is properly construed as requiring that a determination request

---

[7]  The general process under the Property Tax Code begins with an appraisal district setting an appraised value and notice is sent to the property owner.  A property owner may protest that appraised value, 2 TEX. TAX CODE ANN. § 41.41(a)(1) (Vernon 2008) and, if he does, administrative review is available before an appraisal review board.  Generally, to obtain such a hearing, a property owner must file a notice of protest with the appraisal review board within a statutory time frame. See 2 TEX. TAX CODE ANN. §41.44 (Vernon 2008).  The property owner then has a right to appear and present evidence before the appraisal review board.  2 TEX. TAX CODE ANN. § 41.45(b) (Vernon 2008).  Once the appraisal review board issues its order determining the protest, a dissatisfied property owner can file a petition for review with the state district court.  See 2 TEX. TAX CODE ANN., §§ 42.01, 42.21(a) (Vernon 2008). The review by the district court is by trial de novo, 2 TEX. TAX CODE ANN., § 42.23 (Vernon 2008), and the prior findings of the appraisal review board are not admissible.  *Id.*

must be prior to the expiration of the deadline established for review under state law

without possibility of extension under Bankruptcy Code §108.  Thus, it would appear

that, because the applicable period for contesting or determinating the appraisals for tax

years 2007, 2008, and 2009 expired pursuant to §41.44(a)(2) of the Texas Property Tax

Code, this Court is deprived of jurisdiction to make the determination of value as to those

tax years.

However, the Debtor contends that for those tax years the period has not expired

because of the provisions of TEX. PROP. TAX CODE §25.25(c), which provides that:

> The appraisal review board, on motion of the chief appraiser or of a
> property owner, may direct by written order changes in the appraisal roll for
> any of the five preceding years to correct:
>
> > (1)  clerical errors that affect a property owner's liability for a
> > tax imposed in that tax year;
> > (2)  multiple appraisals of a property in that tax year; or
> > (3)  the inclusion of property that does not exist in the form or
> > at the location described in the appraisal roll.

TEX. PROP. TAX CODE §25.25(c) (Vernon 2008).[8]  "The purpose of section 25.25(c) is to

allow late changes to otherwise finalized appraisal records only in situations where the

decision to make the change is based on an objective, factual determination and the

payment of taxes based on the uncorrected records would be fundamentally unfair."

---

[8]  The Texas legislature added a fourth ground regarding lack of ownership to this statute (that is
inapplicable to this suit) with an effective date of May 20, 2011.  See 1 TEX. PROP. TAX CODE §25.25(c)
(Vernon Supp. 2011).

*Benson Chevrolet, Inc. v. Bexar Appraisal Dist.*, 242 S.W.3d 54, 60 (Tex. App. – San Antonio 2007, no pet.).  The Debtor contends that KCAD's listing of each of the Phase I properties by lot and by separate account number on the appraisal roll reveals that the Debtor's property was not properly valued as inventory as is required by §23.12 and that such an error authorizes a change pursuant to TEX. PROP. TAX CODE §25.25(c)(3) as "property that does not exist in the form or at the location described in the appraisal roll."

There is no explanation of the operative phrase in (c)(3) provided by the Property Tax Code.  However, courts have construed the phrase to mean "its identification as a type of property listed under section 25.02(a), such as real property, personal property, an improvement to real property, *or some other physical description of the property on the appraisal roll,* other than its appraised value or its use." *Titanium Metals Corp. v. Dallas County Appraisal Dist.,* 3 S.W.3d 63, 66 (Tex. App.– Dallas 1999, no pet.) (emphasis in original) (citing *Dallas Central Appraisal Dist. v. G.T.E. Directories Corp.*, 905 S.W.2d 318, 321 (Tex. App.– Dallas 1995, writ denied)); *see also, e.g., WB Summit Props., Inc. v. Midland Cent. Appraisal Dist.*, 122 S.W.3d 374, 376 (Tex. App.– El Paso 2003, pet. denied.); *Aramco Assoc. Co. v. Harris County Appraisal Dist.*, 33 S.W.3d 361, 365 (Tex. App.– Texarkana 2000, pet. denied).  "Stated differently, correction of the appraisal roll is only allowed when the appraisal roll erroneously reflects that a particular form of property exists at a specified location and, in fact, no such property exists at that location." *Titanium Metals,* 3 S.W.3d at 66.

That is not the circumstance in this case.  In fact, there is real property at the designated location.  There is real property divided into lots at the designated location.  Thus, the physical description of the property as listed in the appraisal roll is accurate.  The Debtor contends that since the property must be valued as an inventory unit under Chapter 23, it must therefore be listed as a unit under Chapter 25.  While that might be logical, it is not what the statute demands.  Thus, while the Debtor may wish to challenge the valuation process utilized by KCAD to reach a designation of the purported value of each of the lots, the listing of the property by lots on the appraisal roll is not erroneous and the amendment of the appraisal roll under §25.25(c)(3) is not authorized. As one court recently observed,

> [The appraisal district's] failure to properly assess the market value of Lack's inventory was the result of errors in the methodology, procedure, and/or computation.  These are substantive issues that address the actual valuation of the property itself.  However, section 25.25(c) does not make available to the taxpayer the opportunity to challenge the substantive reevaluation of a property's market value.

*LFD Holdings, LLP v. Cameron County Appraisal Dist*., 2012 WL 29337, at *3 (Tex. App. – Corpus Christi, Jan. 5, 2012).  As the *Titanium Metals* decision recognizes in a slightly different context, "[t]o hold otherwise would effectively negate the provisions of chapter 41 and section 25.25(d), both of which impose limits on the time a taxpayer has to challenge the appraised value of property in a taxing district."  *Titanium Metals,* 3 S.W.3d at 66 n.4.  Thus, because the applicable period for contesting or determining the

appraisals for tax years 2007, 2008, and 2009 has, in fact, expired pursuant to §41.44(a)(2) of the Texas Property Tax Code, this Court is deprived of jurisdiction under §505(a)(2)(C) to make any determination of value regarding the Debtor's real property as to those tax years.   The only tax years eligible for determination under §505 are 2010 and 2011.

*Abstention.*

Even if this Court has jurisdiction under §505, it is not required to exercise it. This Court has discretion to determine or not to determine a tax liability.  The Fifth Circuit has recognized six factors to be considered by a bankruptcy court in determining whether it should exercise its discretion to abstain from making a valuation decision.[9] "[S]imply because tax law is somehow implicated does not automatically trigger abstention."  *Internal Revenue Serv. v. Luongo (In re Luongo)*, 259 F.3d 323, 331 (5th Cir. 2001).  The proper focus of this deliberation is the benefit that the exercise of jurisdiction could bring to the general unsecured creditors of the bankruptcy estate — creditors whose claims are statutorily subordinated to the amounts of allowed tax claims — as well as the impact of an abstention decision upon the Debtor and the "fresh start" objective of the Bankruptcy Code.  *Id.* at 330.  In this instance, the most compelling

---

[9]  Those factors include the complexity of the tax issues to be decided, the need to administer the bankruptcy case in an orderly and efficient manner, the burden on the bankruptcy court's docket, the length of time required for trial and decision, the asset and liability structure of the debtor, and the prejudice to the taxing authority. *Internal Revenue Serv.  v. Luongo (In re Luongo)*, 259 F.3d 323, 330 (5th Cir. 2001).

consideration is the potential for  prejudice – not to the taxing authority but to the estate.

The Debtor contends that KCAD and its Chief Appraiser have systematically ignored the

valuation methodology statutorily dictated by state law and that the resulting valuations

have imposed tax burdens upon it that are not justified under the facts or the law.  If

proven, those contentions not only impact the size of the priority tax claims held by

taxing authorities utilizing the work product of KCAD and the degree to which general

unsecured claims are subordinated but, if left unchecked, any excessive tax burdens to be

faced by a reorganized Debtor in the future threatens to jeopardize the successful

consummation of any confirmed plan of reorganization.  Those circumstances dictate the

exercise of this Court's discretionary jurisdiction in this case.

*Excessive Valuation – §25.25(d).*

It is not disputed that the Debtor filed its determination motion with this Court

prior to the time that any tax arising from tax years 2010 and 2011 became delinquent.

Thus, the Debtor invokes the provisions of TEX. PROP. TAX CODE §25.25(d)[10] and seeks

---

[10]  TEX. PROP. TAX CODE §25.25(d) provides that:

(d) At any time prior to the date the taxes become delinquent, a property owner or the
chief appraiser may file a motion with the appraisal review board to change the appraisal
roll to correct an error that resulted in an incorrect appraised value for the owner's
property. However, the error may not be corrected unless it resulted in an appraised value
that exceeds by more than one-third the correct appraised value. If the appraisal roll is
changed under this subsection, the property owner must pay to each affected taxing unit a
late-correction penalty equal to 10 percent of the amount of taxes as calculated on the
basis of the corrected appraised value. Payment of the late-correction penalty is secured
by the lien that attaches to the property under Section 32.01 and is subject to enforced
collection under Chapter 33. The roll may not be changed under this subsection if:

-12-

to correct the purported valuation errors made by KCAD as to the Debtor's real property holdings. The Debtor contends that it meets the "more than one-third" threshold for correction imposed by the statute for both tax years and that it has otherwise met the prerequisites imposed by the statute for challenging the appraisal district's valuations.[11]

The basis for the Debtor's valuation challenge is the allegation that KCAD failed to apply valuation methodology to residential real estate inventory that is required under applicable state law and that the resulting valuations have resulted in excessive tax assessments by the taxing authorities, such as the County, that utilize the KCAD valuations.

Under the Texas Constitution, "all real property ... shall be taxed in proportion to its value"[12] that shall not exceed a ceiling based upon "fair cash market value" for

---

(1) the property was the subject of a protest brought by the property owner under Chapter 41, a hearing on the protest was conducted in which the property owner offered evidence or argument, and the appraisal review board made a determination of the protest on the merits; or

(2) the appraised value of the property was established as a result of a written agreement between the property owner or the owner's agent and the appraisal district.

[11] Kaufman County contends that the Debtor's failure to pay any portion of the taxes for tax years 2010 and 2011 forfeits its right to invoke the remedy provided by §25.25(d) according to TEX. PROP. TAX CODE §42.08(b). However, §505 of the Bankruptcy Code, once properly invoked, authorizes the determination of the amount or legality of any tax . . . *whether or not paid*. . . ." Additionally, it is widely acknowledged that the payment of pre-petition claims prior to confirmation of a plan in a Chapter 11 case is proscribed as a usurpation of the statutory priority scheme and a deviation of the pro rata scheme of distribution envisioned by the Bankruptcy Code. *Chiasson v. Bingler (Matter of Oxford Management, Inc.)*, 4 F.3d 1329, 1334 (5th Cir. 1993). Thus, the Debtor was not authorized to make such a payment. Accordingly, to the extent that §42.08(b) might otherwise act as a condition precedent to the relief sought by the Debtor in this context, it is preempted by the provisions of the Bankruptcy Code.

[12] TEX. CONST. art. VIII, §2.

-13-

valuations upon which ad valorem taxes can be assessed.[13]  "Market value" is a defined

term under the Texas Property Tax Code[14] and that value "shall be determined by the

application of generally accepted appraisal methods and techniques."[15]  The Property Tax

Code also provides for "special appraisal provisions" relating to certain types of taxable

property.  One of those special provisions relates to inventory.  The applicable statute is

TEX. PROP. TAX CODE §23.12(a) which dictates that, with exceptions inapplicable to this

case:

> the market value of an inventory is the price for which it would sell as a unit
> to a purchaser who would continue the business. An inventory shall include
> residential real property which has never been occupied as a residence and
> is held for sale in the ordinary course of a trade or business, provided that
> the residential real property remains unoccupied, is not leased or rented, and

---

[13]  TEX. CONST. art. VIII, §20 provides:
No property of any kind in this State shall ever be assessed for ad valorem taxes at a
greater value than its fair cash market value nor shall any Board of Equalization of any
governmental or political subdivision or taxing district within this State fix the value of
any property for tax purposes at more than its fair cash market value ... .

[14]  The Property Tax Code defines "market value" as the price at which a property would transfer
for cash or its equivalent under prevailing market conditions if:
(A) exposed for sale in the open market with a reasonable time for the seller to find a
purchaser;
(B)  both the seller and the purchaser know of all the uses and purposes to which the
property is adapted and for which it is capable of being used and of the enforceable
restrictions on its use; and
(C)  both the seller and the purchaser seek to maximize their gains and neither is in a
position to take advantage of the exigencies of the other.

1 TEX. PROP. TAX CODE §1.04(7) (Vernon 2008).  However, the "appraised value" of a property might
actually be less than, but not greater than "market value," depending upon whether any statutory
limitations apply.  *See Dallas Cent. Appraisal Dist. v. Cunningham*, 161 S.W.3d 293, 296-97 (Tex. App.
– Dallas 2005, no pet.).

[15]  1 TEX. PROP. TAX CODE §23.01 (Vernon 2008).

-14-

produces no income.

1 TEX. PROP. TAX CODE §23.12(a) (Vernon 2008).

Thus, in the context of a developer of a real estate subdivision engaged in the retail sale of residential real estate lots, §23.12(a) requires that the market value of any qualifying residential real estate inventory be valued at a price for which it would sell as whole unit to a buyer intending to continue the business of selling that inventory in the ordinary course of business.[16] This "unit" approach to valuation applied in this context is designed to be a more precise determination of market value by referring "to what a purchaser would pay for property at the present time in a single transaction, not what might be paid by dozens or even hundreds of purchasers if the property were sold in pieces over an extended period of time." *Travis Cent. Appraisal Dist. v. FM Properties Operating Co.*, 947 S.W.2d 724, 729 (Tex. App. – Austin 1997, pet. denied). It is therefore deemed more accurate in this context as to what a willing buyer would pay for the realty inventory than simply aggregating the listed prices of each unsold individual lot held by the developer in the inventory. *Id*. at 732-33.

The Debtor presented expert testimony regarding the market value of its real estate inventory by Kentner Shell based upon the "subdivision development method" – a recognized method of appraising the value of real property when a subdivision and its development are the highest and best use for the parcel. The Appraisal Institute defines

---

[16] There is really not any evidentiary dispute that the Debtor's property meets the qualifying criteria set forth in the second sentence of §23.12(a).

this appraisal methodology as:

> [A] method of estimating land value when subdivision and development are
> the highest and best use of the parcel of land being appraised.  When all
> direct and indirect costs and entrepreneurial incentive are deducted from an
> estimate of the anticipated gross sales price of the finished lots, the resultant
> net sales proceeds are then discounted to present value at a market-derived
> rate over the development and absorption period to indicate the value of raw
> land.[17]

Specifically in the context of viewing residential real estate inventory as a unit

under §23.12(a), the Austin Court of Appeals endorsed the subdivision development

method in its *FM Properties* decision as an accepted "variation of the income approach to

valuation." *FM Properties,* 947 S.W.2d at 730.  In rejecting a constitutional challenge to

the validity of §23.12 as to real estate, that court concluded that the use of the subdivision

development approach as to real estate inventory is actually more consistent with the

theory undergirding the income approach to valuation because, while considering the

retail sale of the subdivided but unimproved lots, it recognizes the market in which the

inventory will be sold *as a unit*, and it more painstakingly accounts for the *net* income

that a potential purchaser might anticipate deriving from the purchase of the property,

after the deduction of development and marketing costs and with due regard for the time

value of money, rather than merely recognizing a *gross* income figure that might be

anticipated from the sale of each particular parcel over a designated period of time

---

[17] *The Dictionary of Real Estate Appraisal* 279 (Appraisal Inst. 4th ed. 2002). See generally, J.D. Eaton, *Real Estate Valuation in Litigation* 266-72 (Amer. Inst. of Real Estate Appraisers 2d Ed. 1995)

without accounting for the inherent costs. *Id*. at 731-33 (emphasis added). The subdivision development appraisal method thus achieves a more accurate reflection of the market value of real estate inventory held as a unit, particularly when, as with this Debtor, the whole has already been subdivided into tracts and significant infrastructure improvements have already been accomplished.[18]

In order to achieve that more precise result, the court in *FM Properties* recognized the procedural steps of this established appraisal technique required the appraiser to do the following:

(1)  prepare subdivision layout to determine number, size, and shape of typical lots;
(2)  estimate retail value of lots;
(3)  estimate direct development costs;
(4)  estimate indirect development costs;
(5)  compute income residual to developer's profit and land [step 2 minus steps 3 and 4];
(6)  deduct developer's profits from step 5;
(7)  estimate the amount of time required to develop and sell out the subdivision; and
(8)  discount anticipated income stream into a current indicated raw land value.

*Id.* at 729 (citing J.D. Eaton, *Real Estate Valuation in Litigation* 223 (Amer. Inst. of Real Estate Appraisers 1982). That is precisely the analysis performed by Mr. Shell[19] for the

---

[18]  Thus, it eliminates much of the speculation about the applicability of a subdivision development methodology and avoids the reluctance about the utility of the method expressed by the Texas Supreme Court in *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177 (Tex. 2001) which was a condemnation case regarding raw land upon which no development had occurred or been planned. Indeed, the Supreme Court in *Sharboneau* cited the FM Properties decision as an example of a case in which the subdivision development method could produce a reliable estimate of market value because the land had been platted and was already subject to sale. *Id.* at 186.

[19]  Though Mr. Shell does not hold any formal appraiser designations, he does have over 30 years' experience as an active party-participant, lender representative, and consultant in the field of single-family real estate development and finance and he has been involved as the developer or project manager in over 25 real estate development projects. While the Court perhaps might have preferred a witness with more formal credentials, given Mr. Shell's education and experience that familiarized him

tax years 2010[20] and 2011.[21]   In determining the valuation as a unit of inventory,[22] Mr. Shell determined the aggregated retail value of the lots held in the Debtor's inventory based upon actual sales data and other agreed contract price data arising from negotiated deals at arms' length, and increased by a forecast of price escalations or appreciations likely to occur in the lot values over the inventory absorption period.  No deductions were made for direct development costs since the vast majority of those costs have already been incurred by the Debtor.  Indirect development costs for items such as marketing expenses, insurance, taxes and maintenance costs were forecasted and deducted from the aggregated retail value as was an allocation for an entrepreneurial or developer's profit that Mr. Shell established at 8%.  Notwithstanding the Debtor's concerns about the slower rate of annual lot sales experienced at Lighthouse Landing in recent years, Mr. Shell forecasted a 20-year absorption period during which all developed lots would be sold based upon the rate of absorption over the past four years.  At the end, the net income residual for each year was subjected to a significant discount rate of 12%, producing a net present value of $720,314 for tax year 2010 and $581,719.75 for tax year 2011.

_____

with the methodology and his adherence to the designated criteria, and particularly in light of the considerable emphasis that the subdivision development method places on the chronology and costs inherent in the development of a residential subdivision in which he has a particularized expertise, the Court ruled that his analysis was admissible and that any criticisms would go to credibility and the weight to be given to his testimony.

[20]  Ex. 5.

[21]  Ex. 6.

[22]  Since the vast majority of the development has already been platted, step 1 of the analysis was unnecessary.

-18-

Though KCAD did not object to the determination motion filed by the Debtor, its Chief Appraiser, Christopher Peace, offered testimony in defense of the $2,354,980 valuation placed upon the Debtor's property for the 2010 tax year and the identical valuation utilized for the 2011 tax year,[23] notwithstanding a slower sales pattern for the succeeding year likely engendered by the enduring drought that existed for several months in this area.  Mr. Peace stated that he felt that though valuations were reached by separate lot and tract, he thought that an aggregation of the valuations presented by separate lot and tract would result in a unit valuation required by §23.12.  He acknowledged that no written reports regarding valuation of the tracts were created in any tax year.  He further acknowledged that KCAD had not engaged in the multi-step, particularized subdivision development approach in reaching the asserted valuations, although that methodology was precisely the one prescribed by KCAD in the rendition procedures it demanded on its website.[24]  He further acknowledged that KCAD had not published a methodology or procedure for valuing properties as a unit, but he did not believe that the internal methodologies utilized by his staff were required to be disclosed. Those particular internal methodologies were not revealed at the hearing either.  In lieu

---

[23]  Ex. 17.  The valuations reflect a uniform $80,000 appraisal for each of the 13 waterfront lots, $21,750 for every off-water lot (each regardless of size or precise location), a $652,200 appraisal for the 65.22-acre tract, and a $53,780.00 appraisal for the 8.9-acre tract.

[24]  Ex. 18.  A rendition is the reporting of taxable property by a property owner to the appraiser. 1 TEX. PROP. TAX CODE §22.01, et. seq. (Vernon 2008).  *Starflight 50, L.L.C. v. Harris County Appraisal Dist.*, 287 S.W.3d 741, 748 (Tex. App. – Houston [1st Dist.] 2009, no pet.).  An owner seeking to file a rendition must use a form that substantially complies with the form prescribed or approved by the state comptroller and must include all information required by the form.  1 TEX. PROP. TAX CODE §22.24 (Vernon 2008).  The prescribed form [50-143] precisely tracks the subdivision development approach.

thereof, the Chief Appraiser simply stated that "we considered current market value" and then "discounted it 60 to 70%." Given that the discount factor utilized by the District was not precise, the aggregate current retail market value of the Lighthouse Landing lots as a unit as appraised by KCAD ranges from an aggregate of $5,887,450 (prior to 60% discount) to $7,849,933 (prior to 70% discount).[25] Acknowledging that his staff had very little access to actual market data regarding sales, Mr. Peace stated that his staff had relied upon information regarding the sale of lots in prior tax years from 505 Ranch, a different lakefront development in Kaufman County, though the lot size and development amenities were admittedly significantly different from Lighthouse Landing.[26]

Courts have often acknowledged that "[v]aluation outside the actual market place is inherently inexact." *Rushton v. Comm'r*, 498 F.2d 88, 95 (5th Cir. 1974). *See also Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 242 (6th Cir.), *cert. denied*, 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) ["The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either."]; *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 337 (Bankr. S.D. Ohio 1992) ["Valuations of real property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted"]. Because the valuation process often

---

[25] Thus, according to KCAD, the current retail market value (prior to discount) of the Debtor's inventory is in a range of $200,000 to $266,667 for each waterfront lot and $54,375 to $72,500 for each off-water lot.

[26] See Ex. K and L.

involves the analysis of conflicting testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *In re Coates*, 180 B.R. 110, 112 (Bankr. D.S.C. 1995) ["The valuation process is not an exact science and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of . . . [the appraisal] evidence."]. In weighing conflicting valuation testimony, courts generally evaluate a number of factors, including the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. *In re Smith*, 267 B.R. 568, 572-73 (Bankr. S.D. Ohio 2001). *Anderson v. Mega Lift Systems, L.L.C. (In re Mega Systems, L.L.C.)*, 2007 WL 1643182, at *8 (Bankr. E.D. Tex., June 4, 2007) (citing *Smith*, 267 B.R. at 572-73). This Court is not bound to accept the values in the parties' appraisals, written or otherwise; rather, it may form its own opinion of the value of the subject property after considering all of the evidence presented. *Holcomb v. Health Care Servs. v. Quart Ltd., L.L.C. (In re Holcomb Health Care Servs., L.L.C.),* 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004).

Clearly there is a significant variance in the evidence tendered regarding the market value of the Debtor's real property. The Court finds Mr. Shell's testimony to be more credible in this instance than that offered by Mr. Peace. The Court will agree with the sentiment expressed by the Debtor's representative at the hearing and acknowledge the significant burden placed upon KCAD's Chief Appraiser and his staff. A challenging

workload, insufficient resources, and an inability to compel the assimilation of valuation

information undoubtedly hamper the District's ability to do its mandated assignments.

Thus, the Court does not wish to engage in undue criticism of KCAD or its appraisal

staff.  However, the processes utilized by KCAD in this instance in valuing the Debtor's

property can only be described politely as minimalist and Kaufman County's contention

that the Appraisal District has valued the Debtor's property as an inventory is risible.  It is

clear that KCAD and its chief appraiser did not adhere to state law in this instance by

valuing the Debtor's property as a unit of inventory as required by §23.12.  It is rescued

from re-evaluations for excessive values imposed for tax years prior to 2010 only by the

procedural protections imposed by state law.  Though protected, the merits of those

valuations are undoubtedly suspect.

Those observations aside, in evaluating the actual evidence tendered with regard to

this particular real estate inventory, the evidence offered by the Debtor is significantly

more compelling.  The subdivision development methodology is undoubtedly superior to

that utilized by KCAD in this case in seeking to fulfill the statutory mandate of

determining an accurate market value for the Debtor's real property valued as inventory.

It incorporates the sales data as the foundation of the process (limited though it may be in

this case) but then brings other relevant factors into consideration that were clearly not

considered by KCAD in its determination.  If one pardons the pun, it simply renders a

more accurate appraisal of the market situation and the economic factors that would drive

a prospective purchaser to buy an inventory of residential real property lots in the current

market — as opposed to the purchase of one particular lot.  It is that recognition that obviously motivates the Comptroller to mandate the use of this more comprehensive approach by owners who wish to tender a value rendition to appraisal districts, even though this particular district does not utilize that methodology itself.

However compelling the valuation analysis offered by the Debtor through the application of the subdivision development method, it is not inerrant.  This Court is not bound by the precise values tendered by the valuation experts and the Court has reviewed all of the evidence in an effort to form its own opinion regarding the value of the Debtor's property under §23.12.  The starting retail values utilized in the Shell analysis are too depressed in the Court's view.  Though the pace of actual property sales slowed for the Debtor over the relevant years, the fair market values utilized for 2010 deviate remarkably from the limited sales data regarding the retail sales of lots.  Though a higher adjustment could be justified,[27] the Court believes that a 10% increase in the base fair market values for 2010 is appropriate.  The reduced values utilized in the Shell analysis have a bit more validity for 2011, given the lack of sales and the ever-increasing impact of adverse climate conditions as 2011 began.  Thus, the Court finds that 5% increase in the beginning retail values for 2011 is appropriate.

Secondly, the calculation of periodic revenue warrants adjustment.  Under the category "Period Revenue" on the spreadsheets for years 2010 and 2011, the Shell

---

[27]  For example, the only actual sale that occurred in 2010 yielded an actual value that was over 58% greater than the valuation reached in the Shell analysis.

analysis yields uniform returns throughout the covered time periods — $198,209 per period on the 2010 spreadsheet and $159,538.04 per period on the 2011 spreadsheet. These numbers apparently result from taking the total revenue at the end of the absorption period and dividing it by the total number of individual periods (21 in each case). Rather than a true reflection of the revenue from each period, this method yields what is properly termed an *average* periodic revenue. Using such an average period value results in a diminution to the bottom line — the net present value of the cash flows over the entire absorption period — because the average used overstates revenue slightly in earlier periods and understates revenue significantly in later years, when appreciation of the value of sold lots increases the total value realized by the development. Adjusting the Shell analysis to take into consideration the actual lots forecasted to be sold in each period, instead of normalizing the periodic revenue over the entire absorption, therefore increases the value of the subdivision as a whole.

Finally, the calculation of real estate taxes owed or owing in two relevant tax periods warrants adjustment. The methodology for calculating the real estate taxes for each of those years under the Shell analysis seems to begin by taking the total value of the property owned in the subdivision at the beginning of the absorption period — before any forecasted sales take place — and reducing that value to zero in a linear manner. The "Remaining Market Value" at the beginning of each period, therefore, is not reflective of the actual property owned by the subdivision or sold in the previous periods. The "Remaining Market Value" decreases each year by the same amount until it reaches zero

-24-

in 2030 regardless of when property is actually sold.  This approach has no basis in reality or the forecasted sales of the subdivision, and significantly overstates the remaining value of the subdivision in later years.[28]   Adjusting the spreadsheets to reflect the actual reduction in the remaining market value of the subdivision after each period results in an increase in real estate taxes in earlier years (because the remaining market value decreases less if not normalized) and a decrease in the later years (because the bulk of subdivision sales under the Shell forecast occur in the middle of the absorption period). The real estate taxes owed by the subdivision for the property it actually holds at the end of each period change accordingly.

Therefore, with such adjustments and based upon a review of the totality of the evidence, the Court finds that the real property owned by the Debtor as of January 1, 2010 is hereby valued for ad valorem taxation purposes at $877,531.28.  As for tax year 2011, the real property owned by the Debtor as of January 1, 2011 is hereby valued for ad valorem taxation purposes at $736,539.29.  Because these valuations are exceeded by more than 1/3 by the valuations imposed by the Kaufman County Appraisal District for those respective tax years, a correction to those excessive valuations is authorized under TEX. PROP. TAX CODE §25.25(d)[29]

---

[28] According to the 2010 spreadsheet, for example, the "Remaining Taxable Value" of the subdivision in year 2030 is only $164,117, but the value of the property forecasted to be sold that year (without appreciating the property at all from the stated 2010 values) is $203,250.  The appreciated value of the property sold in that period totals $336,073.90.

[29] See supra note 10.

*Conclusion*

Accordingly, the Court concludes that the Debtor's Amended Motion to Determine Ad Valorem Tax Liabilities Under 11 U.S.C. §505 filed by the Debtor and Debtor-in-Possession, Breakwater Shores Partners, L.P. f/k/a Lighthouse Landing Partners, L.P., shall be granted in part and denied in part. The Debtor's Motion shall be denied as to tax years 2007, 2008, and 2009 because this Court is statutorily deprived of jurisdiction under 11 U.S.C. §505(a)(2)(C) to make any determination of value regarding the Debtor's real property as to those tax years. As for tax year 2010, the real property owned by the Debtor as of January 1, 2010 is hereby valued for ad valorem taxation purposes at $877,531.28. As for tax year 2011, the real property owned by the Debtor as of January 1, 2011 is hereby valued for ad valorem taxation purposes at $736,539.29.

Additionally, as a second stage to the final determination of the tax liability due and owing by this bankruptcy estate for tax years 2010 and 2011 based upon the revised valuation figures, the Court will set by separate order a hearing on the Debtor's objection to the claim of Kaufman County with sufficient time for the parties to recalculate the tax assessments and make all appropriate changes to the proof of claim filed by Kaufman County prior to the hearing.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[30] pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters

---

[30] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014.  A separate order will be entered

which is consistent with this opinion.

       Signed on 04/05/2012

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE